# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT JACKSON[1]

May 6, 2026 Session

## STATE OF TENNESSEE v. TRAVIS COHENS

**Appeal from the Criminal Court for Shelby County**

**No. 22-02567      Carlyn L. Addison, Judge**

—————————————————————

## No. W2025-00601-CCA-R3-CD

—————————————————————

The Defendant, Travis Cohens, was convicted by a Shelby County Criminal Court jury of first degree premeditated murder, attempted second degree murder, reckless endangerment, two counts of employing a firearm during the commission of a dangerous felony, and convicted felon in possession of a handgun.  He raises four issues on appeal: (1) whether the trial court erred in admitting evidence of his prior bad acts; (2) whether the evidence is sufficient to sustain his first degree premeditated murder conviction; (3) whether the trial court erred by failing to give a complete and accurate jury instruction as to the knowing and intentional mens rea; and (4) whether the prosecutor engaged in prosecutorial misconduct by misstating the mens rea to the jury during closing argument.[2]  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which J. ROSS DYER and TOM GREENHOLTZ, JJ., joined.

Claiborne Ferguson, Memphis, Tennessee, for the appellant, Travis Cohens.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Steve Mulroy, District Attorney General; and Regina Lucreziano and Venecia Patterson, Assistant District Attorneys General, for the appellee, State of Tennessee.

—————————————————————

[1]  Oral argument in this case was heard in the Shelby County Circuit Courthouse in Memphis.

[2]  We have reordered the Defendant's issues and eliminated a fifth issue on sequential jury instructions that the Defendant withdrew at oral argument.

# OPINION

## FACTS

On March 1, 2022, the Defendant, armed with two handguns and using a borrowed car with tinted windows, waited for his estranged girlfriend, Teonka Gunn ("the victim"), outside her Memphis apartment. The victim pulled up to her apartment complex in a vehicle driven by her cousin, Terrance Cooper, who had his four-year-old son in the back seat. Within a few seconds of the victim's exit from Mr. Cooper's vehicle, the Defendant began shooting at Mr. Cooper's vehicle and at the victim, who fled on foot through the apartment complex chased by the Defendant. The Defendant's final gunshots were fired into the back of the victim's head after she had fallen to the ground. The Defendant was indicted for the first degree premeditated murder of the victim, the attempted first degree premeditated murder of Mr. Cooper, the attempted first degree premeditated murder of Mr. Cooper's son, two counts of employing a firearm during the commission of or attempt to commit a dangerous felony and convicted felon in possession of a handgun.

Prior to trial, the State filed a motion to admit statements by the victim pursuant to Tennessee Rule of Evidence 804(b)(6) and evidence of the Defendant's prior bad acts pursuant to Tennessee Rule of Evidence 404(b). The State sought to introduce evidence relating to the Defendant's October 2, 2021 aggravated burglary, vandalism, and theft of items from the victim's apartment; the Defendant's October 3, 2021 aggravated assault of the victim and vandalism of her vehicle; the victim's October 4, 2021 report to the police of her belief that the Defendant had placed her profile with photographs of her nude on a dating website; and statements the victim made to her cousin on March 1, 2022, about having to close her bank account due to the Defendant's attempts to access her funds. The State argued that it should be allowed to introduce statements the victim made about the Defendant's abusive behavior pursuant to the forfeiture by wrongdoing exception under Rule 804(b)(6) because the Defendant "procured the unavailability of [the victim], and did so, in part, to prevent her from testifying." The State argued that it should be allowed to introduce evidence of the Defendant's prior bad acts pursuant to Rule 404(b) "to prove that the Defendant had a motive for murdering [the victim] and a settled purpose to harm her before her death."

A hearing on the motion was held on April 16, 2024, and September 27, 2024. The State presented two witnesses at the April 16, 2024 setting: Memphis Police Department ("MPD") Officer Ethan Vandevoorde and MPD Lieutenant Keith Phillips. Officer Vandevoorde, who responded to the victim's October 2, 2021 report of the Defendant's

burglary of her apartment, identified his body-worn camera video and testified that the victim told him that the Defendant had called her on the phone to tell her that he had entered her apartment, destroyed her electronics, and stolen a safe. Lieutenant Phillips, who responded to the victim's October 3, 2021 report of the Defendant's having driven into the victim's vehicle as the victim was getting into her vehicle, identified his body-worn camera video and testified that he observed injuries to the victim's left leg and ankle and damage to the victim's vehicle that appeared to have been caused by being struck by another vehicle.

The State presented one witness at the September 27, 2024 setting: Theressia Norman, who said she was the "supervisor of the [Shelby County General Sessions Court] courtroom." Ms. Norman identified court records reflecting that the Defendant was charged in the October 2 and October 3, 2021 incidents with felony vandalism and aggravated assault, respectively, with both cases set for a preliminary hearing on March 9, 2022.

After noting the body-worn camera videos that had been admitted and played at the previous setting, the trial court found that evidence of the burglary and aggravated assault incidents was relevant to show the Defendant's escalation of physical violence and the abusive nature of his relationship with the victim, from which the jury could infer the Defendant's settled intent to harm the victim. Implicit in the trial court's ruling was a finding that the proof of the incidents was clear and convincing. The trial court further found that the evidence was not unduly prejudicial to the Defendant. The trial court found that the "bank account issues" were admissible "under 804(b)(6)" and "as it relates to "404(b)." The trial court disallowed evidence of the victim's October 4, 2021 report to the police about her belief that the Defendant had placed her profile on a dating website, finding insufficient evidence that the Defendant was responsible.

At the Defendant's October 2024 trial, Terrance Cooper testified that the victim, his cousin, called him on March 1, 2022, to ask for a ride to her bank. He said the victim told him that the Defendant had stolen her bank card and was trying to access her account, and that she had to get a new account. He stated that he waited while the victim conducted her bank business and then drove the victim back to her home in the Saints Court Apartments[3] on Watkins Street in Memphis. En route to the victim's home, he stopped to pick up his four-year-old son from school.

---

[3] Mr. Cooper referred to the apartment complex as "Saint Courts." The apartment complex was referred to by other witnesses, variously, as Saints Court, Saints Courts and Saint Court. In pretrial motions, the Defendant refers to it as "Saint's Court." For consistency, we will refer to the apartment complex as Saints Court, regardless of the name used by the witnesses.

Mr. Cooper testified that he pulled into the back parking lot of the apartment complex and parked near the victim's apartment. Almost immediately after the victim got out of his vehicle, Mr. Cooper heard three gunshots, with the third striking his windshield. When he looked up, he saw the victim running across a field and the Defendant chasing her. The Defendant then turned around and began firing at Mr. Cooper's vehicle again. Mr. Cooper testified that he pushed his son down and ducked down in the vehicle. He stated that the Defendant fired at his vehicle approximately five times in total, that four bullets struck his vehicle, and that he was hit and injured on the side of his head by bullet fragments.

Mr. Cooper testified that the victim ran through a gap between her apartment complex and the next apartment complex. As the victim was running through the gap, she "was telling [the Defendant] that, that's my cousin, that's my cousin." At that point, the Defendant stopped firing at Mr. Cooper's vehicle, turned around, and began chasing the victim again. Mr. Cooper said he drove his vehicle out of the apartment complex in time to see the Defendant running across Watkins Street to the other side of the apartment complex. He did not see the Defendant again. He identified the Defendant as the perpetrator to police officers who responded to the scene. He testified that he had once seen the Defendant at a party and on another occasion had cut the Defendant's hair, and that he knew the Defendant as the victim's boyfriend.

On cross-examination, Mr. Cooper testified that he heard the first gunshots four or five seconds after the victim got out of his vehicle. He saw the victim running and the Defendant chasing her until the Defendant stopped and began aiming and firing at Mr. Cooper's vehicle. The Defendant appeared angry. Mr. Cooper was aware that the Defendant had reportedly struck the victim with a vehicle and that the victim had "put a charge on [the Defendant.]" However, there was no "feud" between himself and the Defendant and no reason for the Defendant to shoot at him. When asked if he had any idea why the Defendant shot at him, Mr. Cooper responded that he was driving a vehicle with tinted windows that the Defendant had never seen before, and he thought the Defendant believed the victim was with another man.

On redirect examination, Mr. Cooper testified that after the victim called out to the Defendant that Mr. Cooper was her cousin, the Defendant turned around and "chased [the victim] again."

Thomas VanFrank, who was delivering a pizza to an apartment in the Saints Court apartment complex on the afternoon of March 1, 2022, testified that he had just opened his car door when he heard two gunshots. Within fifteen to twenty seconds, he saw the victim coming from the north side of the complex "holding her stomach and . . . limping." It appeared to him that the victim "was trying her best to run." The victim turned around,

and the Defendant walked up to her and shot her multiple times before running toward the southwest entrance to the complex. Mr. VanFrank described what he saw:

> But at any rate, he just walked up to her, just nonchalantly, and I assume that he shot her in the head. I don't know, but she just hit the ground. Her head faced to the right and her left foot lifted up from the ground. And she wasn't moving. And he just went up to her and just emptied out his gun for another, I don't know, six, seven, eight rounds. I don't know.

Mr. VanFrank identified the apartment complex's surveillance video of the shooting, which was admitted as an exhibit and published to the jury. He said he did not witness the first part of the shooting that was captured on the video recording. He assumed that portion of the shooting occurred on the north side of the building. On cross-examination, he testified that he did not hear the Defendant say anything to the victim.

Ernest Johnson testified that he was dropping someone off at the Saints Court apartment complex on March 1, 2022, when he saw the Defendant pointing "a pistol with a long clip in it" at the victim. The Defendant said something to the victim, "then shots were fired[,]" and the victim began running chased by the Defendant. Mr. Johnson testified that he heard three or four gunshots when the victim and the Defendant were in his view and additional gunshots after they had run around the corner. On cross-examination, he testified that he could not hear what the Defendant said to the victim.

Federal Officer Valesha Jennings, who was working as a MPD patrol officer on March 1, 2022, and was one of the first two officers to respond to the shooting, identified photographs of the deceased victim on the ground, the crime scene, and a gray Nissan Maxima found at the rear of the apartment complex with the driver's door open, the engine running, and a jacket and the Defendant's cell phone on the front passenger seat.

Retired MPD Sergeant Brian O'Nan, who was a crime scene investigator on March 1, 2022, identified photographs of the crime scene, including of the shell casings "strewn across the complex."

Christine Nabors testified that on March 1, 2022, she found in her backyard a jacket with some guns sticking out of it and immediately called the police.

MPD Officer Jeffery Cain, who collected into evidence the jacket and two handguns found in Ms. Nabors's backyard, testified that the first handgun was a semiautomatic Glock with an extended magazine, and the second handgun was a .357 revolver with rounds inside it.

Ashley Jones, who said she and the Defendant were childhood friends, testified that the Defendant contacted her before she went to work on March 1, 2022, asking her to switch cars with him. She stated that the Defendant told her that he wanted to be in a car with tinted windows. When she agreed, the Defendant came to her home, left his car, and took her 2001 gray Nissan Maxima. She later repeatedly texted the Defendant asking for the return of her car, but he never responded. Ms. Jones identified the series of text messages between the Defendant and herself that day, including one in which the Defendant offered her money for sexual intercourse and said: "I'm hurting and I need somebody."

On cross-examination, Ms. Jones testified that the Defendant was "hurting" because "[h]is girlfriend was cheating on him." She said she had never had sexual intercourse with the Defendant and that his asking her for sexual intercourse was unusual. On redirect examination, she testified that the Defendant told her approximately three days prior to March 1, 2022, that the victim was cheating on him.

Tennessee Bureau of Investigation Special Agent Shandra Lynch, an expert in firearms examination, testified that the following items were submitted for her examination: twelve 9-millimeter luger caliber cartridge cases; a Glock 17 Gen4 semiautomatic pistol; a cartridge case that was submitted with the pistol; a Hermann Weihrauch revolver; and two .357 magnum caliber cartridge cases that were submitted with the revolver. She said the twelve 9-millimeter cartridge cases were fired from the Glock pistol and the two .357 magnum caliber cartridge cases were fired from the Hermann Weihrauch revolver. She did not conduct any examination of the unfired cartridges.

Theressia Norman, who identified herself at trial as the supervisor of the Shelby County General Sessions Criminal Court clerks, testified that she had brought the records from two cases to court with her. According to those records, the Defendant was charged in jacket number 21020453 with the aggravated assault of the victim and in jacket number 21020454 with vandalism of property valued at $2,500 or more but less than $10,000. The conditions of the Defendant's release on bail included prohibitions against his contacting the victim and using or possessing a firearm. Both cases were set for a preliminary hearing on March 9, 2022. The Defendant failed to show, bench warrants were issued, and a bench warrant arraignment was set on June 23, 2022.

MPD Officer Ethan Vandevoorde testified about his October 2, 2021 response to the victim's report of the Defendant's burglary of her apartment and identified his body-worn camera video, which was admitted as an exhibit and published to the jury. He stated that the victim, who can be seen on the body-worn camera video entering her apartment through a window, told him that the Defendant had taken her apartment key.

MPD Lieutenant Keith Phillips described his October 3, 2021 response to the domestic disturbance call involving the victim and identified his body-worn camera video, which was admitted as an exhibit and published to the jury. He also identified photographs of the damage to the victim's vehicle, which were admitted as a collective exhibit and published to the jury. He said the victim told him that she was trying to get into her vehicle when the Defendant struck her vehicle with another vehicle.

Dr. Erica Curry, the medical examiner who performed the autopsy of the victim's body, testified that the victim had three gunshot wounds to the left side of the back of her head and one gunshot wound to the back of her left shoulder. The victim also had a graze wound to a finger on her right hand, likely caused by "a bullet going past her finger," another graze wound on the right ear "from a bullet going past her ear[,]" an exit wound by the top of her eyebrow, and another exit wound "right at the top of the right side of the forehead[.]" Based on the amount of gunpowder stippling on the back of the victim's head, Dr. Curry estimated that the end of the gun was two to three feet from the victim's head when the shots to the head were fired. Dr. Curry testified that the cause of death was gunshot wounds of the head and left shoulder, and the manner of death was homicide.

MPD Lieutenant Joseph Rucker testified that what appeared to be the victim's identification and bank debit cards were found inside Ms. Jones's Nissan Maxima. He said he obtained a warrant for the Defendant's arrest while other investigators were still on the crime scene. Several months later, the Defendant was arrested in California.

The Defendant elected not to testify and rested his case without presenting any proof. Following deliberations, the jury convicted him in count one of first degree premeditated murder as charged in the indictment, in count two of the lesser-included offense of attempted second degree murder, in count three of the lesser-included offense of reckless endangerment, and in counts four and five of the indicted offense of employing a firearm during the commission of a dangerous felony. After the parties introduced a stipulation that the Defendant had been convicted of a qualifying offense under Tennessee Code Annotated section 39-17-1307, the jury convicted the Defendant in count six of the indicted offense of convicted felon in possession of a handgun. The Defendant was sentenced to life for count one, 15 years for count two, 11 months and 29 days for count three, 6 years for count four, 4 years for count five, and 2 years for count six. The trial court ordered all counts to be served consecutively except for count three. This resulted in a total effective sentence of 27 years in the Tennessee Department of Correction.

## ANALYSIS

### I. Admission of Prior Bad Acts Evidence

The Defendant frames this issue as whether the trial court erred "when it held that [the] Defendant's prior bad acts were admissible under Rule 404(b) and the forfeiture by wrongdoing doctrine?" However, the Defendant's only mention of the forfeiture by wrongdoing doctrine in the argument section of his brief consists of the following conclusionary sentence: "Along with the 404(b) issue, the Court allowed statements to be admitted under the forfeiture by wrongdoing doctrine that was in error." The rest of the Defendant's argument revolves around whether the trial court erroneously admitted 404(b) evidence of the "wholly unproven burglary accusation and car accident with no known malicious intent[.]" We, thus, agree with the State that the Defendant has waived our consideration of whether the trial court erred in its application of the forfeiture by wrongdoing doctrine by his failure to provide appropriate references to the record, argument, or citation to authorities. *See* Tenn. Ct. Crim. App. R. 10(b).

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Such evidence may, however, be admitted for other purposes if the following conditions are met prior to admission of this type of proof:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). "[O]ther purposes" include the defendant's motive, intent, guilty knowledge, identity, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. *See State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004).

If the trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. *State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005) (citations omitted).

"Tennessee courts have recognized a 'line of cases' that stand for the proposition 'that violent acts indicating the relationship between the victim of a violent crime and the

defendant prior to the commission of the offense are relevant to show [the] defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim.'" *State v. Jarman*, 604 S.W.3d 24, 49 (Tenn. 2020) (quoting *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993)).

The Defendant argues that the burglary and aggravated assault incidents did not establish the violent nature of his relationship with the victim, his hostility toward the victim, or his plan to kill the victim and instead served "only to prejudice the jury against [him] by showing a propensity for violence." In support, the Defendant relies on the fact that, unlike in *Smith*, there was no evidence of his having threatened to harm or kill the victim. We respectfully disagree. As the State notes in its brief, not all threats are directly verbalized. Here, the Defendant threatened the victim by breaking into the victim's apartment to vandalize and steal her belongings before calling to inform her that he was responsible. The Defendant threatened and caused physical injury to the victim by ramming her vehicle with his vehicle as she was trying to get inside her vehicle. In both incidents, the Defendant's actions showed the Defendant's hostility toward the victim and the abusive nature of their relationship. We agree with the State that the evidence was relevant to show the Defendant's motive, intent, and settled purpose to harm the victim. We further agree that the probative value of the evidence on those material issues was not outweighed by the danger of unfair prejudice. We, therefore, conclude that the trial court acted within its discretion in admitting the evidence.

## II. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his first degree premeditated murder conviction, arguing that there was "not a moment when he was free from the excitement or the passion that caused him to begin shooting" and "almost no reason to believe that [he] acted after the exercise of any level of reflection or judgment." In support, he cites the lack of any evidence that he made declarations of his intent to harm or kill the victim. He also asserts that he made no specific preparations for the encounter and that none of the witnesses "described [him] as calm at any point during this encounter." The State argues that there was ample evidence that the Defendant acted with premeditation. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v.*

*Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Reynolds*, 635 S.W.3d 893, 915 (Tenn. 2021) (citation omitted). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

First degree premeditated murder is defined as "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* at § 39-11-302(a). "Premeditation" is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* at § 39-13-202(e). Whether premeditation exists is a factual question for the jury to determine from all the evidence, including the circumstances surrounding the killing. *Reynolds*, 635 S.W.3d at 916 (citations omitted).

Our supreme court has provided a non-exclusive list of circumstances from which a jury may infer premeditation, which includes the defendant's use of a deadly weapon on an unarmed victim, the infliction of multiple wounds or repeated blows, the defendant's destruction or secretion of evidence after the killing, the defendant's calmness after the

killing, evidence of a motive for the killing, lack of provocation by the victim, evidence that the victim was retreating or attempting to escape when killed, and the failure to render aid to the victim. *Id.* (citations omitted).

Viewed in the light most favorable to the State, the evidence establishes the Defendant, who faced a March 9, 2022 preliminary hearing for his felony vandalism and aggravated assault charges against the victim, borrowed a car with tinted windows, armed himself with two handguns, and drove to the victim's apartment to wait for her arrival. When the victim arrived in a vehicle that was unfamiliar to him, the Defendant, who believed the victim had been unfaithful, fired at the victim outside the vehicle and at Mr. Cooper inside the vehicle. The victim fled, and the Defendant chased her. The Defendant then stopped, turned, and began shooting at Mr. Cooper's vehicle again until the victim called out that Mr. Cooper was her cousin. At that point, the Defendant began chasing and shooting at the victim again. The Defendant's final gunshots were fired into the back of the unarmed victim's head after she had fallen to the ground.

Contrary to the Defendant's assertion that no witness described him as calm, an eyewitness to the final gunshots testified that the Defendant "nonchalantly" walked up to the victim, who was trying to run, shot her, and then stood over her fallen body and "emptied his gun" into her. In addition to the eyewitness testimony, the jury was able to view the shooting and the Defendant's and the victim's respective actions by watching the apartment complex's surveillance video. After the shooting, the Defendant immediately fled the scene, discarding his guns in a neighboring backyard and leaving the state. From all this evidence, a jury could reasonably infer that the Defendant acted with premeditation. We, therefore, affirm the Defendant's conviction for first degree premeditated murder.

### III.  Jury Instructions

The Defendant contends that the trial court erred in its jury instructions by conflating the knowing and intentional mens rea. Specifically, he complains that the trial court failed to instruct the jury, pursuant to *State v. Page*, 81 S.W.3d 781 (Tenn. Crim. App. 2002), Tennessee Code Annotated section 39-11-301(a)(2), and Tennessee Pattern Jury Instruction 7.05(a), that the requirement of knowingly is also established if it is shown that the defendant acted intentionally. The Defendant argues that the failure to so instruct the jury deprived him of his constitutional right to a fair trial because he admitted he was guilty of killing the victim and "[t]he only issue for the jury was whether this was first degree murder, second degree murder, or voluntary manslaughter." The Defendant also argues that the trial court erred by using "the wrong 'Knowingly' instruction" and by not "limit[ing] it to the 'result of conduct' portion of the instruction." The State argues that the Defendant has waived the issue by his failure to timely object at trial and that the Defendant is not entitled to plain error relief.

"It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *Dorantes*, 331 S.W.3d at 390. Furthermore, trial courts have a duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *Faulkner*, 154 S.W.3d at 58. "Challenges to jury instructions present mixed questions of law and fact; therefore, we review challenged instructions de novo without a presumption of correctness." *State v. Smith*, 492 S.W.3d 224, 245 (Tenn. 2016) (citing *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001)).

A party's failure to raise a contemporaneous objection to an incomplete jury charge results in waiver of the issue on appeal. *Faulkner*, 154 S.W.3d at 58. However, "[a]n erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection." *Id.* (citations omitted).

The Defendant first brought up the jury instruction issue during the State's rebuttal argument after the prosecutor referred to second degree murder as a "non-intentional" crime and said, "This is not just a knowing killing, a reasonably certain thing." The Defendant objected that the prosecutor's statement was "a little bit of misstatement of law since knowing can be found in an intentional act" and that the trial court's jury instructions "didn't have it in there."

The Defendant also raised the issue in his motion for new trial. At the hearing on the motion for new trial, defense counsel explained that he failed to notice that the instruction was missing when he reviewed the trial court's proposed jury instructions because it had "always been there" and he was not focused on that issue at the time. He said he was "shocked" to see that the language was not there when he began "flipping through the jury instructions" upon the prosecutor's misstatement of the law in closing argument. In response, the prosecutor, among other things, cited *Faulkner*, 154 S.W. 3d at 61, to argue that any error in the jury instructions on second degree murder was rendered moot due to the jury's having convicted the Defendant of first degree murder.

In his reply brief, the Defendant characterizes the omission of the language that knowingly is established by proof a defendant acted intentionally as an "erroneous or inaccurate" jury charge rather than an incomplete jury charge. As such, he argues that he

is not limited to plain error review because he raised the issue not only in his motion for new trial but also during closing arguments during the trial. We respectfully disagree.

The trial court issued the following sequential jury instruction:

> In deciding the guilt or innocence of the defendant, you shall first consider the offense charged in count one of the indictment. If you unanimously find the defendant [guilty] of first degree—defendant guilty of first degree murder beyond a reasonable doubt, you shall return a verdict of guilty for that offense.
>
> If you unanimously find the defendant not guilty of first degree murder or if you unanimously have a reasonable doubt of the defendant's guilt of that offense, your verdict must be not guilty of first degree murder[,] and you shall then proceed to consider whether or not the defendant is guilty of the next lesser included offense in order from greatest to least within count one of the indictment.

If the jury followed the trial court's sequential instructions, as we presume it did, its verdict finding the Defendant guilty of first degree premeditated murder as charged in count one means that it never reached, much less considered, the lesser-included offense of second degree murder. Under these circumstances, any error in the instruction on how the knowing element of second degree murder may be established is moot. *See Faulkner*, 154 S.W.3d at 61 (holding that because the defendant "was not convicted of second degree murder, his issue regarding the erroneous instruction defining 'knowingly' is moot"). The Defendant accordingly cannot establish that a clear and unequivocal rule of law was breached, or that a substantial right of the accused was adversely affected, as would be required for either plenary or plain error relief. *See Smith*, 24 S.W.3d at 282.

## IV. Prosecutorial Misconduct

The Defendant contends that the prosecutor committed prosecutorial misconduct by misstating the law regarding the intent element of first and second degree murder in closing and rebuttal arguments. In support, he cites the prosecutor's statement in closing that "[t]his was not a knowing killing. This was intentional." He also cites the prosecutor's references during rebuttal argument to second degree murder as a "non-intentional" crime. The Defendant argues that the prosecutor's "argument served only to muddle and confuse the mens rea issues in the case" and adversely affected the outcome of his trial "as the jury was instructed and then told by the prosecutor that the [D]efendant's defense was ineffective." The State notes that the trial court issued a curative instruction to the jury that

- 13 -

it was to rely on the instructions given by the trial court and argues that no prosecutorial misconduct occurred. We agree with the State.

Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." *State v. Zirkle*, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Middlebrooks*, 995 S.W.2d 550, 557 (Tenn. 1999).

The five generally recognized areas of prosecutorial misconduct occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. *Goltz*, 111 S.W.3d at 6.

For a defendant to be entitled to a new trial on the basis of allegedly improper remarks during closing argument, the comments must be shown to have prejudiced the case by affecting the jury's verdict. *Middlebrooks*, 995 S.W.2d at 559. In determining whether this occurred, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. *Id.* at 560.

We agree with the State that no prosecutorial misconduct occurred in closing and rebuttal arguments. The complained-of comments did not constitute a misstatement of the law, and the trial court appropriately addressed the Defendant's objection by issuing a curative instruction to the jury that it was to rely only on the instructions of the trial court as to the law to be applied in the case.

## CONCLUSION

Based on our review, we affirm the judgments of the trial court.


s/JOHN W. CAMPBELL
JOHN W. CAMPBELL, SR., JUDGE